# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Heartland Publications, LLC, <u>et al.</u>,[1] | Case No. _____ |
| Debtors. | Joint Administration Requested |

## DECLARATION OF MICHAEL C. BUSH, PRESIDENT AND CHIEF EXECUTIVE OFFICER OF HEARTLAND PUBLICATIONS LLC, IN <u>SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS</u>

I, Michael C. Bush, being duly sworn, deposes and says:

1.      I am the President and Chief Executive Officer of Heartland Publications, LLC, a corporation organized under the laws of the state of Delaware and one of the affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>").

2.      I have been employed by the Debtors and served as President and Chief Executive Officer for approximately five (5) years.  As such, I am generally familiar with the Debtors' day-to-day operations, financial conditions, business affairs, and books and records.  I submit this declaration (the "<u>Declaration</u>") on the Debtors' behalf in conjunction with their petitions and in support of the various motions and applications for orders filed with the Court contemporaneously herewith (collectively, the "<u>First Day Pleadings</u>").

3.      Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge; my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees; my discussions with other members of the Debtors' management team; or my opinion based upon experience, expertise,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Heartland Publications, LLC (5642) and Heartland Publications Holdings, LLC (5683).  The mailing address for Heartland Publications, LLC is 1 West Main Street, Clinton, CT 06413.  The mailing address for Heartland Publications Holdings, LLC is 405 Park Avenue, Suite 702, New York, NY 10022.

and knowledge of the Debtors' operations and financial condition. In making my statements based on my review of the Debtors' books and records, relevant documents, and other information prepared or collected by the Debtors' employees, I have relied upon these employees accurately recording, preparing, or collecting any such documentation and other information.

4.      I am over the age of 18 and am competent to testify.

5.      If I were called to testify as a witness in this matter, I could and would testify competently as to the veracity of the facts set forth herein.

6.      The Declaration is divided into two parts. Part I of this Declaration provides background information about the Debtors, their business operations, and the circumstances surrounding the commencement of these chapter 11 cases. Part II sets forth the relevant facts in support of each of the Debtors' First Day Pleadings.

**PART I**

**BACKGROUND**

**A.      <u>Chapter 11 Filings</u>**

7.      On December 21, 2009 (the "<u>Petition Date</u>"), each of the Debtors filed in this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"). The Debtors continue to operate their businesses and manage their properties and will act as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.

**B.      <u>Identification of Debtors</u>**

8.      The Debtors consist of two (2) affiliated entities, Heartland Publications Holdings, LLC ("<u>Heartland Holdings</u>"), a Delaware corporation, and Heartland Publications, LLC ("<u>Heartland Publications</u>"), a Delaware corporation. Heartland Publications is wholly

2

owned by Heartland Holdings, and Heartland Holdings is wholly owned by Heartland Parent Holdco, LLC ("Heartland Holdco")

## C.   Non-Debtor Affiliates

9.      On November 11, 2009, Heartland Holdco was formed by Wicks Communications & Media Partners, L.P. ("Wicks Communications") (48.61%), Wicks Parallel (Limited) Partnership I, L.P. ("Wicks Parallel") (1.26%),  Wachovia Capital Partners 2004 ("Wachovia") (49.87%), and Michael Bush (.26%) (collectively, the "Members").  Heartland Holdco was capitalized by capital contributions from the Members in the form of assignments to Heartland Holdco of all of the then outstanding equity interests in Heartland Holdings.

## D.   Nature of Debtors' Business Operations

10.     The Debtors operate a media business that primarily focuses on newspaper publishing.  In addition, the Debtors operate an interactive business which offers website complements to their newspaper properties.

11.     The Debtors' operations are headquartered in Middlesex County, Connecticut and extend to ten (10) states within the United States, including:  Georgia, Kentucky, North Carolina, Ohio, Oklahoma, South Carolina, Tennessee, Virginia, and West Virginia.  In the conduct of their operations, the Debtors utilize the services of approximately 762 employees, of which, approximately 362 are hourly and 400 are salaried.  In addition, the Debtors employ the services of 370 independent contractors.

12.     The Debtors produce approximately fifty (50) paid publications consisting of community newspapers (dailies and weeklies) and specialty publications in medium and small sized markets.  The newspapers include, without limitation, the following, listed by state:

Georgia:  *LaGrange Daily News* and *The Thomaston Times*

DB02:8921664.7                                                                                                                  068674.1001

Kentucky: *Grayson County News Gazette, News Democrat Leader, The Daily News, The Floyd County Times, The Harlan Daily Enterprise News,* and *The Hazard Herald*

North Carolina: *Richmond County Daily Journal, The Anson Record, Apex Herald, Bladen Journal, The Weekly Independent, Fuquay-Varina Independent, Garner News, Holly Springs Sun, Red Springs Citizen, St. Pauls Review, The Robesonian, The Sampson Independent, The Pilot News, The Yadkin Ripple, The Laurinburg Exchange, Jefferson Post, The Elkin Tribune, Stokes News* and *Mt. Airy News*

Ohio: *Gallipolis Daily Tribune, The Daily Sentinel, The Daily Times, The Community Common,* and *Sunday Times Sentinel*

Oklahoma: *Altus Times, Durant Daily Democrat,* and *Frederick Leader*

South Carolina: *The Cheraw Chronicle, Herald Independent, The Pickens Sentinel, The Easley Progress, The Powdersville Post, Newberry Observer,* and *The Union Daily Times*

Tennessee: *Claiborne Progress* and *Macon County Times*

Virginia: *Carroll News*

West Virginia: *Gilbert Times, Pineville Independent Herald, Point Pleasant Register, Williamson Daily News, Coal Valley News,* and *Logan Banner*

## E. History

13. Heartland Publications was formed in April 2004 with a single acquisition of 22 publications from the Community Newspaper Holdings, Inc. newspaper group. Historical highpoints in the Debtors' subsequent expansion include several significant purchases, including: the acquisition of Ohio newspaper, *The Community Common*, from Brown Publishing; the acquisition of several North and South Carolina newspapers, shoppers, and other niche magazines from several companies including, Crescent Holdings LLC and Mid South Management Co., Inc.; the acquisition of West Virginia newspapers, *The Logan Banner* and *The Coal Valley News,* from Community Newspaper Holdings, Inc.; the acquisition of North Carolina newspapers, the *Richmond County Daily Journal* and the *Anson Record*, and South

4

Carolina newspaper, *The Cheraw Chronicle*, from Community Newspapers Holdings, Inc.; and

the acquisition of North Carolina weekly newspapers, *The Red Springs Citizen*, *St. Pauls Review*

and *Extra Slice*, from Stewart McLeod.

**F.      Directors and Executive Officers**

14.      The board of directors of Heartland Holdings consists of six (6) individuals, of

which, two (2) members were appointed by Wachovia, two (2) members were appointed by

Wicks Communications, one (1) member was appointed by Wicks Parallel, and one (1) member

is the manager of Heartland Holdings.  The current board members are:  Matthew E. Gormly III,

Daniel M. Kortick, Craig B. Klosk, L. Watts Hamrick, III, Walker Simmons, and Michael Bush.

15.      The Debtors' senior management team includes:  Michael Bush, President and

Chief Executive Officer; Gary Lawrence, Chief Operating Officer; Joe Craig, Regional

Publisher; Lynn McLamb, Regional Publisher; and James Kreps, Chief Financial Officer.

**G.      Revenue Sources**

16.      Revenue for the Debtors' newspaper publishing segment is derived primarily

from advertising (both print and online) and secondarily from paid circulation (including single

copy sales and subscription sales).  Advertising revenue consists of two basic categories: retail

and classified.  Newspaper revenue tends to follow a distinct and recurring seasonal pattern, with

higher advertising revenue in months containing significant events or holidays.  Accordingly, the

fourth quarter has historically been the strongest, followed by the second quarter, and the third

quarter.  The first quarter has historically been the weakest.  The Debtors anticipate that

advertising revenue growth will increasingly come from online advertising.  Thus, the Debtors

have been committed to building and supporting a portfolio of online products and services that

are uniquely tailored to each of their local communities.  The Debtors' online activities include websites supporting their newspapers.

17.     For the trailing twelve months ended October 31, 2009, the Debtors had revenues of approximately $55,171,404 resulting in EBITDA of approximately $13,904,427.

**H.     Financial Constraints**

18.     The newspaper publishing industry is facing many challenges including the continuing recession and a  shift in consumer and advertiser behavior.  While the Debtors have repeatedly outperformed the industry due to their local market concentration and tightly managed operations, the severe economic downturn in the general economy has caused the Debtors to experience a meaningful decline in revenue for 2008 and 2009.  The Debtors' 2008 revenue decreased 4.8% over pro forma 2007 revenue and the Company projects that revenue for 2009 will decrease an additional 11.6% over 2008.

19.     A key factor in the Debtors' decreased revenue has been a steady decline in the advertising environment.  The advertising environment is influenced by the state of the overall economy, including unemployment rates, inflation, energy prices, consumer interest rates, and the availability of credit.  Historically, advertising revenue has increased in periods of economic growth and declined during national, regional, and local economic downturns.  Thus, the Debtors' revenue and operating results since 2007 have been significantly impacted by the ongoing recession.  The duration and depth of the recession in markets in which the Debtors operate may further reduce their future revenues, operating results, and cash flows.  In addition, competition from internet based advertising alternatives, particularly in the classified employment advertising category, has continued to erode traditional print media sources of revenue.

DB02:8921664.7                                                          068674.1001

20.     Increases in certain cost centers have had a significant effect on the Debtors' operating results.  Wages are the company's largest cost center, and as a consequence of increases in minimum wage expense in West Virginia, Ohio, Oklahoma, North Carolina, and South Carolina, and more recently federally, the Debtors experienced a $70,000 increase in wages during 2008, and expect a $165,000 increase in 2009.  In addition, the cost of newsprint, the company's second largest cost center has increased almost 20%.  Finally, the company's net revenue has been negatively impacted by steady increases in ink and petroleum pricing that have increased delivery and production costs nearly 30%.

## I.     Efforts to Address Financial Constraints

21.     In response to declining revenues, the Debtors have been actively engaged in efforts to right-size their cost structure and implement cost-savings initiatives.  Indeed, throughout 2008 and continuing through 2009, the Debtors have undertaken aggressive cost-cutting measures and pursued numerous revenue initiatives to improve bottom-line performance.  For example, the Debtors:  (i) enacted full time employment reductions; (ii) significantly reduced overtime by approximately $165,000 for the last six (6) months; (iii) now require CEO approval for all hiring decisions; (iv) adopted smaller trim sizes across their newspaper portfolio to mitigate rising newspaper prices (thus eliminating unprofitable circulation revenue and reducing overall page counts); (v) eliminated unprofitable commercial printing; and (vi) re-staffed under-performing newspapers.  These cost-cutting measures resulted in reduced operating expenses in 2008 of approximately $4.1 million versus 2007 and the Company has budgeted a further $1.3 million decrease in operating expenses for 2009.

DB02:8921664.7                                                                                          068674.1001

**J.**     **Assets and Liabilities**

22.     The Debtors' primary indebtedness consists of two secured credit facilities:  (i) the second amended and restated credit agreement dated as of June 11, 2007 (the "First Lien Credit Facility"), among Heartland, as borrower, Holdings, as guarantor, and General Electric Capital Corporation ("GECC"), as administrative agent and lender, and certain other lenders (collectively, and with GECC, the "First Lien Lenders"); and (ii) the credit agreement dated as of June 11, 2007 (the "Second Lien Credit Facility"), among Heartland, as borrower, Holdings, as guarantor, and Silver Point Finance, LLC as administrative agent ("Silver Point") and certain other lenders (collectively, and with Silver Point, the "Second Lien Lenders"; together, the First Lien Lenders and the Second Lien Lenders shall be referred to as the "Prepetition Lenders").

23.     The First Lien Credit Facility consists of a $10 million senior secured revolving credit facility (the "First Lien Revolver") and a $110 million senior secured term loan facility (the "First Lien Term Loan").  As of November 3, 2009 the total outstanding indebtedness under the First Lien Revolver, including accrued interest, is $3,541,760, and under the First Lien Term Loan is $107,894,638.  The Second Lien Credit Facility consists of a $41.0 million term loan (the "Second Lien Term Loan").  As of November, 2009, the total outstanding indebtedness under the Second Lien Term Loan, including accrued interest, is $44,933,506.

24.     As collateral for the obligations incurred under the First Lien Credit Facility, the Debtors granted to GECC, for the benefit of the First Lien Lenders, a first-priority security interest in and lien upon substantially all of the Debtors' assets.  As collateral for the obligations incurred under the Second Lien Credit Facility, the Debtors granted to Silver Point, for the benefit of the Second Lien Lenders, a second-priority security interest in and lien upon substantially all of the Debtors' assets.

25.    As of October 31, 2009, the Company reported approximately $134,251,612 in total assets and approximately $166,166,014 in total liabilities (unaudited), including the claims under the First and Second Lien Credit Facilities (excluding accrued and unpaid interest, contingent letter of credit obligations, and related fees).  Substantially all of the Debtors' assets have been pledged to secure the First and Second Lien Debt.

26.    Notwithstanding the Debtors' continuing efforts to reduce costs and increase revenues, as of December 12, 2008, the Debtors were in payment default under the First Lien Credit Facility, and as of February, 2009, the Debtors were in payment default under the Second Lien Credit Facility.  Since that time, the Debtors have been engaged in negotiations with the Prepetition Lenders in an effort to restructure their balance sheet.  Against this backdrop and in light of their weakened operating results and significant liquidity challenges, the Debtors have concluded that the most responsible course of action is to restructure their balance sheet through these chapter 11 proceedings in order to restore liquidity, return to financial health and preserve the value of their business for their stakeholders.

**K.    Use of Chapter 11 Process**

27.    The Debtors intend to utilize the tools available to them under chapter 11 to improve their balance sheet and strengthen their businesses for the benefit of creditors, customers, employees, and the communities in which the Debtors operate.  Towards that end, the Debtors have negotiated and executed a plan term sheet with the First Lien Lenders, which provides for meaningful returns to the Prepetition Lenders, and the potential for payment in full of all of the Debtors' other trade creditors.

28.    In accordance with the schedule agreed to by and between the Debtors and the First Lien Lenders, the Debtors intend to move as quickly as possible through the chapter 11

process, optimizing their ability to protect their business operations and maximize the value of their enterprise for the benefit of all parties in interest entitled to share in such value under the Bankruptcy Code.

## PART II

## FACTS IN SUPPORT OF FIRST DAY PLEADINGS

29.     To enable the Debtors to operate effectively and to transition seamlessly into chapter 11, the Debtors have filed the First Day Pleadings, requesting various types of immediate relief.  I am familiar with the contents of each of the First Day Pleadings and I believe that the relief sought is critical to stabilizing the Debtors' business operations, preserving value, and facilitating an effective transition into chapter 11.  Moreover, absent the immediate ability to make certain essential payments as sought in the First Day Pleadings, I believe the Debtors' estates would suffer immediate and irreparable harm.

**A.      Motion of the Debtors for an Order Directing Joint
         Administration of Related Chapter 11 Cases**

30.     The Debtors believe that many of the motions, applications, hearings and orders that will arise in these chapter 11 cases will jointly affect each and every Debtor.  Under these circumstances, the Debtors believe that the interest of the Debtors, their estates, their creditors and other parties in interest would be best served by the joint administration of these chapter 11 cases for procedural purposes only.  The Debtors further believe that joint administration of these chapter 11 cases will ease the administrative burden on the Court and all parties in interest and will protect creditors of the respective estates against potential conflicts of interest.

31.     For these reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**B.    Application for an Order Authorizing the Debtors to Retain and Employ Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent Nunc Pro Tunc to the Petition Date**

32.    By this application, the Debtors seek entry of an order authorizing the Debtors to retain Epiq Bankruptcy Solutions, LLC ("Epiq") as their claims, notice and balloting agent ("Agent").  Upon information and belief, Epiq is an experienced Agent and is frequently used by debtors in large chapter 11 cases, and I believe Epiq is well qualified to serve as Agent in these cases.  The employment of Epiq will also provide the Debtors with efficient management of the claims, noticing and balloting processes in these cases, leaving the Debtors' management and professionals to focus on the Debtors' reorganization efforts.

33.    For these reasons I believe that the relief requested in this motion is in the best interest of the Debtors, their creditors and all parties in interest, and should be approved.

**C.    Debtors' Motion for Order (i) Authorizing Maintenance of Existing Bank Accounts, (ii) Authorizing Use of Existing Business Forms, and (iii) Authorizing Use of Existing Cash Management System**

34.    By this Motion, the Debtors seek entry of an order authorizing the maintenance of existing bank accounts, authorizing use of existing business forms, and authorizing use of existing cash management system.  In connection with this relief, the Debtors respectfully request a waiver of certain of the operating guidelines established by the Office of the United States Trustee for the District of Delaware that require the Debtors to close all prepetition bank accounts, open new accounts designated as debtor-in-possession accounts, and provide new business forms and stationary.

35.    As described in detail in the motion, the Debtors maintain a cash management and disbursement system in the ordinary course of their operations (the "Cash Management System").  To lessen the disruption caused by the bankruptcy filings and maximize the value of their estates in these chapter 11 proceedings, it is vital to the Debtors that they maintain their

Cash Management System. The Debtors maintain current and accurate accounting records of daily cash transactions and submit that maintenance of this Cash Management System is vital to prevent undue disruption to the Debtors' restructuring efforts while protecting the Debtors' cash for the benefit of their estates. Substantially disrupting their current cash management procedures would impair the Debtors' operations and their ability to transition into chapter 11.

36. To minimize expenses to these estates, the Debtors also request that they be authorized to continue to use all checks and business forms existing immediately prior to the Petition Date, without reference to the Debtors' status as a debtors-in-possession.

37. For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**D. Debtors' Motion for an Order Authorizing (i) Payment of Certain Prepetition Taxes and (ii) Financial Institutions to Process and Cash Related Checks and Transfers**

38. Prior to the Petition Date, the Debtors incurred obligations (collectively, the "Taxes") to federal, state, and local governments (collectively, the "Authorities"). Although as of the Petition Date the Debtors were substantially current in the payment of assessed and undisputed Taxes, certain Taxes attributable to the prepetition period were not yet due. Taxes attributable to the 2008 tax year and to the prepetition portion of the 2009 tax year will not be due until the applicable monthly, quarterly, or annual payment dates -- in some cases immediately and in others not until next year.

39. Nonpayment or delayed payment of Taxes may also subject the Debtors to efforts by certain governmental entities, whether or not permissible under the Bankruptcy Code, to revoke the Debtors' licenses and other privileges either on a postpetition or post-confirmation basis. Moreover, certain of the Taxes are sales, use, gross receipts, or payroll taxes, which may

12

be considered to be trust funds that are not included in property of the Debtors' estates, and/or taxes as to which the Debtors' officers and directors may be held directly or personally liable in the event of nonpayment.  In such events, collection efforts by the governmental entities would provide obvious distractions to the Debtors and their officers and directors in their efforts to bring these chapter 11 cases to an expeditious conclusion.

40.    Therefore, I believe it is appropriate to pay, and the Debtors seek the authority to pay, in their sole discretion, the Taxes, including any penalties and interest thereon, if any, and any liability resulting from audits of prepetition Taxes, to the relevant Authorities in the ordinary course of business.

41.    For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

**E.    Motion of the Debtors for Interim and Final Orders (i) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Utility Services, (ii) Deeming Utility Companies Adequately Assured of Future Performance, and (iii) Establishing Procedures for Determining Adequate Assurance of Payment**

42.    By this motion, to ensure continued provision of utility services (the "Utility Services") to the Debtors' facilities, the Debtors seek entry of an order prohibiting utility companies (the "Utility Companies") from terminating services on account of prepetition invoices, deeming the Utility Companies to be adequately assured of future payment, and establishing procedures to determine additional adequate assurance.  The Debtors are not currently aware of any past due amounts owed to any of the Utility Companies.  However, because of the timing of the filings in relationship to the Utility Companies' billing cycles, there may be utility costs that have been invoiced to the Debtors for which payment is not yet due and

utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtors.

43.     The Utility Services are crucial to the continued operations of the Debtors.  If the Utility Companies refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted, and the Debtors could be forced to cease operations.

44.     The Debtors intend to pay all postpetition obligations owed to the Utility Companies in a timely manner. Nevertheless, to provide additional assurance of payment for future services to the Utility Companies, the Debtors will deposit approximately 50% of the estimated monthly cost of the Utility Services, into a newly created, segregated, interest-bearing account, within twenty (20) days of the Petition Date (the "Adequate Assurance Deposit").  The Adequate Assurance Deposit would be maintained with a minimum balance equal to 50% of the Debtors' estimated monthly cost of Utility Services, which may be adjusted by the Debtors to account for the termination of Utility Services by the Debtors or other arrangements with respect to adequate assurance of payment reached with individual Utility Companies.

45.     The Debtors submit that the Adequate Assurance Deposit, in conjunction with the Debtors' ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  If any Utility Company believes that additional assurance is required, they may request such assurance pursuant to the Additional Adequate Assurance Procedures described in the Utilities Motion.

46.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

DB02:8921664.7                                                      068674.1001

**F. Motion of Debtors for Order Authorizing Payment of Prepetition Obligations Under, and Continuation of, Customer Programs**

47.     By this Motion, the Debtors seek entry of an order authorizing, but not directing, them (a) to pay and otherwise honor their prepetition obligations under ordinary course customer practices and programs, including, among other things, prepayments, refunds, discounts, price adjustments, error credits, volume rewards, billing adjustments, advertising guarantees, joint advertising arrangements, credit card programs, solicitations, contests, customer service, and other practices and programs (collectively, the "Customer Programs"), whether such obligations are owed to customers directly or to third parties whose goods or services are integral to the ability of the Debtors to implement, or their customers to participate in, the Customer Programs, and (b) to otherwise continue, and honor their postpetition obligations under, the Customer Programs in the ordinary course of business during the pendency of these cases.

48.     Prior to the Petition Date, and in the ordinary course of business, the Debtors engaged in certain practices, in the form of the Customer Programs, to develop and sustain their positive reputations with subscribers, advertisers, and the marketplace generally. The Customer Programs, which are customary in the Debtors' industry, are used to generate goodwill, meet competitive market pressures, and ensure customer satisfaction, thereby retaining current customers, attracting new ones, and ultimately enhancing revenue and profitability. Notwithstanding the commencement of these chapter 11 proceedings, the Debtors desire to continue, in their sole discretion and to the extent they deem necessary and desirable, those Customer Programs that they believes are beneficial to their business operations and therefore their bankruptcy estates.  The Debtors believe that such relief is necessary to preserve critical customer relationships and their business in general.  Accordingly, the Debtors request the Court

to authorize them to continue the Customer Programs postpetition and in the ordinary course of their business.

49.     Additionally, because some of the Customer Programs, as they relate to prepetition agreements between the Debtors and their customers, may represent unperformed prepetition obligations, the Debtors seek authority from this Court to perform all prepetition obligations under the Customer Programs.  The success and ultimate viability of the Debtors' business is dependant upon the Debtors' continuing relationships with their advertisers, subscribers, and other customers.  The Debtors believe that in order to maintain such relationships and to ensure customer loyalty, the Debtors must continue the Customer Programs. In the competitive industry in which the Debtors operate, failure to honor the Customer Programs arising from advertising, subscription, delivery, and other relationships that are the same or similar to their competitors is likely to have a material adverse impact on the Debtors' ability to attract new customers and maintain existing ones.  Even a short delay by the Debtors in continuing their Customer Programs could cause serious and irreparable harm to the value of the Debtors' estates.

50.     The Debtors submit that the total amount to be paid or credited to customers if the Court grants the requested relief is de minimis compared with the losses that the Debtors could suffer if the patronage of their customers erodes at the outset of these cases.  In sum, maintenance of the Customer Programs is essential to the continued vitality of the Debtors' businesses and, ultimately, to their prospects for a successful reorganization.  The Debtors thus submit that permitting them to honor the Customer Programs is in the best interests of their estates, their creditors, and all other parties in interest.

DB02:8921664.7                                                           068674.1001

51.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**G.    Motion for Order Authorizing Debtors to Maintain Existing Insurance Policies and Pay All Policy Premiums Arising Thereunder or in Connection Therewith**

52.     In connection with the operation of their businesses and management of their properties, the Debtors maintain various insurance policies, obtained through several third-party insurance carriers (collectively, the "Insurance Carriers").  The insurance policies include coverage for, without limitation, the following: commercial liability, multimedia liability, property, earthquake, automobile liability, umbrella/excess liability, and employment practices liability.  The third-party claims that are covered by the insurance policies are neither unusual in amount nor in number in relation to the extent of the business operations conducted by the Debtors.

53.     Maintenance of insurance coverage under the various insurance policies is essential to the continued operation of the Debtors' businesses and is required under the United States Trustee's Operating Guidelines for Chapter 11 Cases, the laws of the various states in which the Debtors operate, and the Debtors' various financial agreements.  Thus, the Debtors submit that they should be authorized to continue to pay insurance policy premiums as such premiums come due in the ordinary course of the Debtors' business.

54.     To the extent that the obligations owed to the Insurance Carriers may be attributed to prepetition insurance coverage, the Debtors believe that payment of such obligations is necessary to ensure continued coverage under the Insurance Policies, and to maintain good relationships with the Debtors' insurers.  The Debtors' maintenance of their relationships with

DB02:8921664.7                    068674.1001

their insurers is critical to ensuring the continued availability of insurance coverage and reasonable pricing of such coverage for future policy periods.

55.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

**H.     Debtors' Motion for an Order Authorizing (i) Payment of Prepetition Employee Wages, Salaries and Other Compensation; (ii) Reimbursement of Prepetition Employee Business Expenses; (iii) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (iv) Payment of Workers' Compensation Obligations; (v) Payments for Which Prepetition Payroll Deductions were Made; (vi) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; (vii) Payment of 2009 Bonus Amounts and (viii) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions**

56.     Pursuant to this motion, the Debtors are seeking authority to honor and pay certain prepetition employee wages, salaries and other accrued compensation, and to continue to honor certain other policies, programs and benefits the Debtors provide to their employees (the "Employees") in the ordinary course of business.  The Debtors' workforce performs a variety of critical functions for the Debtors, and their skills, knowledge and understanding of the Debtors' business, infrastructure, and operations are essential to the effective operation of the Debtors' business, and the preservation of the value of the Debtors' assets.  Without the continued services of their Employees, the continuation of the Debtors' businesses and implementation of their restructuring strategy will not be possible.

57.     To minimize the personal hardship that the Employees will suffer if prepetition Employee-related obligations are not paid when due or as expected, as well as to maintain morale and an essential workforce during this critical time, the Debtors seek authority, in accordance with their stated policies, to:  (a) pay all prepetition Employee wages, salaries and

other accrued compensation; (b) reimburse all prepetition Employee business expenses; (c) make all contributions to prepetition Employee benefit programs, and continue such programs in the ordinary course of business; (d) honor workers' compensation obligations; (e) pay, upon notice to interested parties and a final hearing, amounts due and owing under the Debtors' 2009 bonus plan; (f) make all payments for which prepetition payroll deductions were made; (g) pay all processing costs and administrative expenses relating to the foregoing payments and contributions; and (h) make all payments to third parties incident to the foregoing payments and contributions.

58.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

## I.      Debtors' Motion for Entry of Order Authorizing Debtors to Pay Prepetition Obligations of Certain Critical Vendors and Service Providers

59.     The Debtors are engaged in the media business, operating in the newspaper publishing industry, with support from their interactive division.  The Debtors' revenues are derived primarily from advertising, and the strength of those revenues is dependent on the size of their newspaper readership, which in turn is dependent on their ability to deliver their products – newspapers, television programming, and online services.  The Debtors believe that payment of the prepetition fixed, liquidated and undisputed claims (the "Critical Vendor Claims") of certain critical suppliers of products and services, with whom the Debtors continue to do business and whose products and services are essential to the Debtors' operations (the "Critical Vendors") that are associated with these various business lines is vital to the Debtors' ability to deliver their products and, thus, to their effort to preserve and maximize value for all stakeholders.

60.     Although the Debtors believe that many of their vendors and service providers will continue to do business with them after commencement of these cases, the Debtors anticipate that certain Critical Vendors will: (a) refuse to deliver products and services (including access to systems or data) without payment of their prepetition claims; (b) refuse to deliver products and services on reasonable price or credit terms absent payment of prepetition claims, thereby effectively refusing to do business with the Debtors; or (c) suffer significant financial hardship, such that the Debtors' non-payment of prepetition claims would destroy a Critical Vendor's business and, therefore, its ability to supply the Debtors with products and services.

61.     Accordingly, the Debtors seek entry of an order granting them authority to pay Critical Vendor Claims.  The Debtors propose to condition the payment of Critical Vendor Claims on the agreement of individual Critical Vendors to continue supplying products and/or services to the Debtors on the same trade terms that, or better trade terms than, such Critical Vendors offered the Debtors immediately prior to the Petition Date or, if more favorable, within the 90 day period prior to the Petition Date, or pursuant to such other trade practices and programs that are favorable to the Debtors.

62.     The Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and creditors, and therefore should be approved.

**J.     Motion of the Debtors for Interim and Final Order Authorizing Use of Cash Collateral and Granting Related Relief**

63.     It is essential to the Debtors' efforts to stabilize their operations and preserve the value of their assets that they obtain the authority to use the cash derived from operating the businesses claimed as collateral by the Prepetition Lenders (the "Cash Collateral").  The Cash Collateral will be used to pay for certain budgeted expenses during the pendency of these chapter 11 cases.  Such expenses include, but are not limited to, employee payroll and other benefits,

DB02:8921664.7                                                                    068674.1001

rent, and other expenses related to the Debtors' business operations. The Debtors have prepared a budget, with the assistance of Duff & Phelps Securities, LLC, their financial advisor, that shows the Debtors' projected expenditures during the period from the Petition Date to April 2, 2010 and estimates the period in which such cash expenditures will need to be paid. While the Debtors believe that the use of Cash Collateral will be sufficient to fund their operations in the short term, they reserve their rights to pursue postpetition financing necessary to ensure that sufficient liquidity exists during the pendency of these cases to fund their operations and prosecute a proposed plan of reorganization.

64.     The reasons supporting the Debtors' need to use Cash Collateral during the course of these cases is compelling. As the Debtors have no unencumbered funds, use of Cash Collateral is required to meet day-to-day operating expenses, such as employee wages, vendor invoices, and other expenses necessary to sustain the Debtors' businesses. Indeed, absent access to sufficient funds to support the Debtors' business operations, the value of the Debtors' estates may quickly erode and the Debtors could be hastily forced into an asset liquidation. Therefore, authorization to use Cash Collateral is in the best interests of the Debtors' estates and creditors.

65.     For the foregoing reasons, the Debtors submit, and I believe, that the relief requested in this motion is in the best interest of the Debtors, their estates and their creditors, and therefore should be approved.

**<u>CONCLUSION</u>**

Accordingly, for the reasons states herein and in each of the First Day Pleadings, the Debtors request that the relief sought in the First Day Pleadings be approved.

I swear under penalty of perjury that the foregoing is true and correct.

Dated: December 21, 2009

Heartland Publications, LLC, <u>et</u> <u>al.</u>
Debtors and Debtors in Possession

_/s/ Michael C. Bush_
Michael C. Bush
President and Chief Financial Officer
Heartland Publications, LLC

22