**EXHIBIT 1**

Melzer Declaration

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Heartland Publications, LLC, et al.,[1] | Case No. 09-14459 (KG) |
| Debtors. | Jointly Administered |

**DECLARATION OF JON C. MELZER IN SUPPORT OF DEBTORS' APPLICATION FOR ORDER PURSUANT TO 11 U.S.C. §§ 327(a) AND 328(a), FED R. BANKR. P. 2014 AND DEL BANKR. L.R. 2014-1 (I) AUTHORIZING AND APPROVING EMPLOYMENT AND RETENTION OF DUFF & PHELPS SECURITIES, LLC AS FINANCIAL ADVISOR AND INVESTMENT BANKER *NUNC PRO TUNC* TO THE PETITION DATE AND (II) WAIVING CERTAIN INFORMATION REQUIREMENTS OF DEL. BANKR. L.R. 2016-2**

I, Jon C. Melzer, hereby declare that the following is true to the best of my knowledge, information and belief:

1.      I am a Managing Director of the firm Duff & Phelps Securities, LLC (together with its wholly owned subsidiaries, agents, affiliates and independent contractors, "Duff & Phelps"), a restructuring and advisory firm with its headquarters at 55 East 52nd Street, 31st Floor, New York, NY 10055. This declaration is submitted in support of the Debtors' Application for Order (I) Pursuant to 11 U.S.C. §§ 327(a) and 328(a), Fed. R. Bankr. P. 2014 and Del. Bankr. L.R. 2014-1 Authorizing and Approving Employment and Retention of Duff & Phelps Securities, LLC as Financial Advisor and Investment Banker and (II) Waiver of Certain Information Requirements of Del. Bankr. L.R. 2016-2 (the "Application"). The statements contained herein are based upon personal knowledge.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Heartland Publications, LLC (5642) and Heartland Publications Holdings, LLC (5683). The mailing address for each of the Debtors is 1 West Main Street, Clinton, CT 06413.

2. To the extent that any information disclosed herein requires amendment or modification upon Duff & Phelps' receipt of additional information or as additional creditor information becomes available, a supplemental declaration will be submitted to the Court.

## DUFF & PHELPS QUALIFICATIONS

3. The Debtors seek to employ Duff & Phelps as their exclusive financial advisor and investment banker because of Duff & Phelps' extensive experience and knowledge of the Debtors' business, financial affairs and capital structure, in addition to Duff & Phelps' expertise in business reorganizations under chapter 11 of the Bankruptcy Code. Since July 2009, Duff & Phelps professionals have been working closely with the Debtors' management and other professionals to review strategic options, coordinate the professional services necessary for Debtors' restructuring and prepare the Debtors to file these chapter 11 cases.

4. Duff & Phelps was founded in 1932 to provide high quality investment research. Over the next six decades, the firm diversified by adding investment banking, credit rating and investment management services. In 2005, Duff & Phelps strengthened its core valuation capabilities with the acquisition of Standard & Poor's Corporate Value Consulting business. Since then, Duff & Phelps has continued to expand and develop. In 2006, it acquired Chanin Capital Partners, LLC, a specialty investment bank with a leading position advising stakeholders in distressed situations.

5. Duff & Phelps has extensive experience in providing restructuring and financial advisory services in reorganization proceedings, and has an excellent reputation for the services it has rendered in chapter 11 cases on behalf of debtors and creditors throughout the United States. The professionals of Duff & Phelps have been employed as financial advisors and investment bankers in a number of troubled company situations, including the chapter 11 cases

2

in the District of Delaware of Lang Holdings, Inc., Anchor Blue Retail Group, Inc., Crucible Materials Corporation, Dura Automotive Systems and Calpine, among others. As such, the Debtors believe that Duff & Phelps is well-qualified and able to advise the Debtors in a cost-effective, efficient, and timely manner.

6.     I joined Duff & Phelps in 2008. I am a managing director in the firm's New York office. I have more than 20 years of experience in investment banking. Prior to joining Duff & Phelps, I was Co-Head of Mergers and Acquisitions at Houlihan Lokey Howard & Zukin, Head of Consumer & Industrial Products at PricewaterhouseCoopers Securities, Head of Mergers & Acquisitions at Rodman & Renshaw, Inc. and Co-Head of Corporate Sales & Divestitures at The First Boston Corporation. I have successfully completed more than 150 transactions during my investment banking career.

## COMPENSATION RECEIVED BY DUFF & PHELPS FROM THE DEBTORS

7.     Prior to the Petition Date, Duff & Phelps received $600,000 in compensation and $5,015.40 in expense reimbursements from the Debtors.

## PROFESSIONAL COMPENSATION

8.     <u>Monthly Advisory Fee</u>. As specifically provided in the Engagement Letter,[2] a copy of which is attached hereto as <u>Exhibit C</u>, and the Application, the Debtors have agreed to pay to Duff & Phelps $100,000 per month commencing on the Petition Date and monthly thereafter (the "<u>Monthly Fees</u>").

9.     The payment of the Monthly Fees (and any other fees described herein) shall be subject to the Court's final approval and shall be in compliance with applicable

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings given such terms in the Engagement Letter.

provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, guidelines established by the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee"), and any other applicable procedures and orders of the Court. Duff & Phelps' Monthly Fees for these chapter 11 cases are consistent with and typical of arrangements entered into by Duff & Phelps and other comparable firms in connection with the rendering of similar services under similar circumstances. These rates and the rate structure reflect that such restructuring and other complex matters are typically national in scope and involve great complexity, high stakes, and severe time pressures.

10.     Restructuring Fee. In addition to the Monthly Fees, the Debtors have agreed to pay to Duff & Phelps a Restructuring Fee in the amount of $850,000 in cash if, during the term of Duff & Phelps' engagement, or within the twelve (12) months following the termination of the engagement (the "Residual Period"), (i) any Restructuring Transaction is consummated or (ii) an agreement in principle, definitive agreement or Restructuring Plan to effect a Restructuring Transaction is entered into within such Residual Period and concurrently therewith or at any time thereafter.

11.     Sale Fee. If a Sale occurs either: (i) during the term of Duff and Phelps' engagement or (ii) at any time during the Residual period, the Company agrees to pay Duff & Phelps a success fee ("Sale Fee"), payable in cash concurrently with closing of the Sale, equal to the greater of (i) the sum of 1.25% of the first $115 million of Consideration and 3.0% of any Consideration above $115 million, and (ii) $850,000. In no event shall Duff & Phelps be entitled to both a Restructuring Fee and a Sale Fee, provided, however, if both fees are applicable, Duff & Phelps shall be entitled to the greater of the two fees.

DB02:8987050.2                                                                                              068674.1001

12.　Out-of-Pocket Expenses.　Duff & Phelps shall be reimbursed for its reasonable out-of-pocket and incidental expenses as documented for travel, meals, lodging, legal fees and other miscellaneous expenses, incurred during the term, and in furtherance, of its engagement, subject to reasonable documentation requirements.　Such expenses exceeding $50,000 require that Duff & Phelps seek the Debtors' prior written consent with respect to reimbursement.

13.　The following professionals are presently expected to have primary responsibility for providing services to the Debtors: Jon C. Melzer and Eric R. Williams.　In addition, from time to time, other professionals will provide required services to the Debtors.

14.　To the best of my knowledge, (i) no commitments have been made or received by Duff & Phelps with respect to compensation or payment in connection with these cases other than in accordance with applicable provisions of the Bankruptcy Code and the Bankruptcy Rules, and (ii) Duff & Phelps has no agreement with any other entity to share with such entity any compensation received by Duff & Phelps in connection with these chapter 11 cases.

## DISINTERESTEDNESS

15.　In connection with the preparation of this Declaration, Duff & Phelps conducted an analysis to determine whether it holds or represents any interests adverse to the Debtors.　Such analysis consisted of a review of its contacts with the Debtors and certain entities holding large claims against or interests in the Debtors that were made reasonably known to Duff & Phelps by the Debtors.　A listing of the parties reviewed is reflected in Exhibit A to this Declaration.　Duff & Phelps' review included providing a list of such parties to all Duff & Phelps employees worldwide and conducting a query of such parties in a database containing the names

5

of individuals and entities that are represented by Duff & Phelps. A summary of such relationships that Duff & Phelps identified during this process is set forth in Exhibit B hereto.

16.  Based on the results of its review, to the best of my knowledge, except as discussed below, Duff & Phelps does not have an active relationship with any of the parties listed in Exhibit A in matters related to these proceedings.

17.  In addition to the above, Duff & Phelps has provided and could reasonably be expected to continue to provide services unrelated to the Debtors' cases for the various other entities shown on Exhibit B. Duff & Phelps' assistance to these parties has been related to providing various financial restructuring, litigation support, business consulting and/or tax services. To the best of my knowledge, no services have been provided to these parties in interest which involve their rights in the Debtors' cases, nor does Duff & Phelps' involvement in these cases compromise its ability to continue such consulting services.

18.  Further, as part of its diverse practice, Duff & Phelps appears in numerous cases, proceedings, and participates in transactions that involve many different professionals, including attorneys, accountants, and financial consultants, who represent claimants and parties in interest in the Debtors' chapter 11 cases. Further, Duff & Phelps has performed in the past, and may perform in the future, advisory consulting services for various attorneys and law firms, and has been represented by several attorneys and law firms, some of whom may be involved in these proceedings. Based on our current knowledge of the professionals involved, and to the best of my knowledge, none of these relationships create interests materially adverse to the Debtors in matters upon which Duff & Phelps is to be employed, and none are in connection with these cases.

19.     Duff & Phelps does not believe it is a "creditor" of any of the Debtors within the meaning of section 101(10) of the Bankruptcy Code. Further, neither I nor any member of the Duff & Phelps engagement team serving the Debtors, to the best of my knowledge, is a holder of any of the Debtors' debt or equity securities.

20.     To the best of my knowledge, no employee of Duff & Phelps is a relative of, or has been connected with, any judge of the Bankruptcy Court for this district, the United States Trustee in this district or any employee of the office of the United States Trustee in this district. Duff & Phelps has not reviewed the relationships that the members of the Duff & Phelps engagement team may have against a comprehensive list of employees within the U.S. Trustee's office in this District, but will do so upon being provided with a list of such persons by the office of the U.S. Trustee.

21.     To the best of my knowledge, Duff & Phelps is a "disinterested person" as that term is defined in section 101(14) of the Bankruptcy Code, in that Duff & Phelps:

(a)     is not a creditor, equity security holder, or insider of the Debtors;

(b)     was not, within two years before the date of filing of the Debtors' chapter 11 petitions, a director, officer, or employee of the Debtors; and

(c)     does not have an interest materially adverse to the interest of the Debtors' estates or of any class of creditors or equity security holders.

22.     In addition, to the best of my knowledge and based upon the results of the relationship search described above and disclosed herein, other than as described herein, Duff & Phelps neither holds nor represents an interest adverse to the Debtors.

23.     If any new material, relevant facts or relationships are discovered or arise, Duff & Phelps will promptly file a supplemental declaration pursuant to Bankruptcy Rule 2014(a).

7

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this ___24th___ day of December, 2009

_____
Jon C. Melzer

## EXHIBIT A

The following lists contain the names of reviewed entities, as described more fully in the Melzer Declaration. Where the names of the entities reviewed are incomplete or ambiguous, the scope of the search was intentionally broad and inclusive, and Duff & Phelps reviewed each entity in its records, as more fully described in the Melzer Declaration, matching the incomplete or ambiguous name.

**DEBTORS**
1. Heartland Publications, LLC
2. Heartland Publications Holdings, LLC

**SHAREHOLDERS**
1. Wicks Communications & Media Partners, L.P.
2. Wicks Parallel (Limited) Partnership I, L.P.
3. Wachovia Capital Partners 2004
4. Michael Bush

**SECURED LENDERS**
1. General Electric Capital Corporation
2. Silver Point Finance, LLC

**MAJOR UNSECURED CREDITORS**
1. SP Newsprint
2. Wells Fargo Insurance Services
3. Newberry County Treasurer
4. Page Coop
5. Quality Web Printing
6. Bowater America Inc.
7. US Post Office
8. Artisitci Color Graphics LLC
9. Chernoff Diamond & Co In
10. Fisher & Phillips LLP
11. Abitibi - consolidated sales
12. King Features Syndicate
13. Staples Business Advantage
14. Computer Design Center
15. Pickens Count Treasurer
16. Shroom
17. AGFA Corporation
18. Superior Lithoplate of Indiana
19. US Ink
20. PBI Printing Inc.

# EXHIBIT B

## Conflict Check Results

**Duff & Phelps has active engagements with the following entities (or its related entity):**

Bank of America (Bingham and Schulte engagements)
GECC
Heartland Publications, LLC
Staples Business Advantage
Wells Fargo Insurance Services

**Duff and Phelps has recent (within the last 6 years) or current client relationships with the following entities (or its related entity):**

Bank of America
Bowater America Inc.
GECC
Heartland Publications
Silver Point
Staples Business Advantage
Wachovia
Wells Fargo Insurance Services
Wicks Communications & Media Partners, LP
Wicks Parallel (Limited) Partnership I, LP

# EXHIBIT C

# DUFF & PHELPS SECURITIES, LLC

July 29, 2009

*__Privileged and Confidential__*

Michael C. Bush
President and Chief Executive Officer
Heartland Publications, LLC
1 West Main Street
Clinton, CT 06413

Dear Michael:

The purpose of this letter is to confirm the understanding and agreement (the "Agreement") with Heartland Publications, LLC (together with its subsidiaries and affiliates, "Heartland" or the "Company") concerning the engagement of Duff & Phelps Securities, LLC ("DPS") by the Company.

1.  Engagement:  DPS is being retained to act as the exclusive financial advisor to the Company in connection with any Restructuring Transaction, as defined below, involving the Company.  Upon retention, DPS will work at the reasonable request and direction of the Company and in conjunction with other advisors retained by the Company to:

    (a)  Review and analyze the Company's business and financial condition;

    (b)  Assist the Company in the preparation of cash flow projections and long-term financial projections;

    (c)  Evaluate the Company's strategic and financial alternatives;

    (d)  Advise the Company on tactics and strategies for negotiating with the holders of the existing debt obligations and other stakeholders;

    (e)  Advise the Company on the negotiation of a waiver and amendment of its credit facility;

    (f)  Render financial advice to the Company and participate in meetings or negotiations with the creditors and other stakeholders in connection with the above;

    (g)  Assist the Company in preparing descriptive material to be provided to potential parties to a restructuring transaction;

    (h)  Assist the Company in evaluating, structuring, negotiating and implementing the terms and conditions of any restructuring transaction, including a sale of assets and a balance sheet restructuring;

    (i)  Assist the Company in raising debt and/or equity capital to facilitate a restructuring;

(j)     Provide the Company with other appropriate restructuring advice; and

(k)     Perform other such services as DPS and the Company shall mutually agree.

The advisory services and compensation arrangements set forth herein do not encompass other investment banking or financial advisory services not set forth in this Paragraph 1, if any, for which DPS may be retained by the Company. Any other services will be evidenced by a separate agreement or agreements between the Company and DPS. In performing its services pursuant to this Agreement, DPS is not assuming any responsibility for the Company's decision to pursue (or not to pursue) any business strategy or to effect (or not to effect) any Restructuring Transaction or other transaction; and DPS will not act, or be deemed to have acted, in any managerial or fiduciary capacity whatsoever for the Company. DPS makes no representations or warranties concerning the Company's ability to successfully improve its operations, maintain or secure sufficient liquidity to operate its business or successfully complete a Restructuring Transaction. The Company agrees that DPS shall not have any obligation or responsibility to provide accounting, audit, or "crisis management" services for the Company and shall have no responsibility for designing or implementing operating, organizational, administrative, cash management or liquidity improvements, or to provide any valuation opinions or any advice or opinions with respect to solvency in connection with any Transaction. The Company confirms that it will rely on its own counsel, accountants, and similar expert advisors for legal, accounting, tax and other similar advice.

2.    Term of Agreement: This Agreement shall commence as of the date of this letter and shall continue until the earlier of (i) expiration of 10 days after either party gives written notice of termination to the other party and (ii) the effective date of a Restructuring Transaction. Upon any termination, the provisions of Paragraph 3 shall survive the termination of this Agreement as provided therein, including the obligation to pay the Restructuring Fee in accordance with the provisions of Paragraph 3(b). The provisions of Paragraphs 4 through 16 and Schedule I shall also survive the termination of this Agreement and shall remain in effect.

3.    Fees and Expenses: As compensation for the services rendered by DPS hereunder, the Company shall pay DPS as follows:

(a)    Monthly Advisory Fee: Upon execution of this Agreement (the "Engagement Date"), the Company shall be liable for and shall pay to DPS a non-refundable cash retainer of $125,000 which shall be for services rendered the first 30 days of the engagement. Thereafter, the Company shall pay to DPS a non-refundable cash fee of $125,000 per month for the next three (3) months and $100,000 per month beginning the fifth month, which amounts shall be paid in advance on or about each monthly anniversary of the Engagement Date (the "Monthly Advisory Fee" or the "Monthly Advisory Fees") for each month of the engagement through the earlier of (i) termination of this agreement in accordance with Paragraph 2 hereof or (ii) the effective date of a Restructuring Transaction.

(b)  Restructuring Fee: In addition, if during the term of this engagement or within 12 months following the termination of the engagement (the "Residual Period"), (i) any Restructuring Transaction is consummated or (ii) an agreement in principle, definitive agreement or Restructuring plan (the "Plan") to effect a Restructuring Transaction is entered into within such Residual Period and concurrently therewith or at any time thereafter, such Restructuring Transaction is consummated pursuant to such agreement or Plan (as the same is amended or modified), DPS shall be entitled to receive a Restructuring Fee in cash, contingent upon the consummation of a Restructuring Transaction and payable at the closing thereof, equal to $850,000; provided, however, if a Restructuring Transaction is completed within three (3) months of the Engagement Date, the Restructuring Fee shall equal $500,000.

(c)  Financing Fee: In addition, if during the term of this engagement or within six months following the termination of the engagement, the Company consummates a capital raising transaction and during the term of this engagement DPS at the written request of the Company, (i) produced marketing materials related to a capital raising transaction and/or (ii) approached lenders other than members of the Company's existing bank group or equity sponsors to solicit interest in providing capital, DPS will be entitled to receive upon the first and any subsequent closing of the sale of any securities or financing placement a fee (such fees collectively, the "Financing Fee") equal to: (a) 1.5% of the principal amount of any senior secured debt raised, plus 3.0% of the principal amount of any unsecured or mezzanine debt raised, plus 5.0% of the agreed value of any equity raised.

(d)  Expense Reimbursement: The Company shall reimburse DPS for its reasonable out-of-pocket expenses incurred in connection with the services to be provided under this Agreement on the applicable monthly anniversary of the Engagement Date, subject to reasonable documentation requirements; provided however, that if such expenses exceed $50,000 ("Overage"), individually, or in the aggregate, DPS shall seek the Company's prior written consent with respect to any reimbursement over any such Overage. Out-of-pocket expenses shall include, but not be limited to, all reasonable travel expenses, computer and research charges, attorney fees, messenger services and long-distance telephone calls incurred by DPS in connection with the services to be provided to the Company

"Restructuring Transaction" means any recapitalization or restructuring (including, without limitation, through any exchange, conversion, cancellation, forgiveness, retirement and/or a material modification or amendment to the terms, conditions or covenants thereof) of the Company's preferred equity and/or debt securities and/or other indebtedness, obligations, or liabilities (including preferred stock, partnership interests, lease obligations, or trade credit facilities), that is achieved, without limitation, through a Chapter 11 plan of reorganization, exchange offer, tender, consent solicitation, rescheduling of debt maturities, changes in interest rates, settlement or forgiveness of debt, conversion of debt and/or other liabilities into equity, or sale or other transfer of equity, assets or other interests of the Company whatsoever, whether in one or a series of transactions, acquisitions, mergers or other business combinations; it being

understood that neither a modification of capital or operating leases in the ordinary course nor a restructuring of an immaterial portion of the Company's capital or operating leases will constitute a Restructuring in and of itself. For purposes of this Agreement, the restructuring of the Company shall include its affiliates as a single "Restructuring Transaction".

4.   Company Information and Coordination: The Company recognizes and confirms that in rendering services hereunder, DPS will be using and relying on, and assuming the accuracy of, without any independent verification, data, material and other information (collectively, the "Information") furnished to DPS by or on behalf of the Company or other third parties (including their agents, counsel, employees and representatives).   The Company understands that DPS will not be responsible for independently verifying the accuracy of the Information and shall not be liable for inaccuracies in any such Information.   The Company will use reasonable efforts to assure that all Information supplied to DPS by or on behalf of the Company will, as of its respective dates, be accurate and complete in all material respects. Furthermore, the Company will reasonably cooperate with DPS in all phases of its financial advisory services.

In order to coordinate efforts to effect a Restructuring Transaction, during the period of DPS's engagement hereunder, neither the Company nor any other person acting on the Company's behalf shall, directly or indirectly (except through DPS), solicit any offer from any party to enter into a Restructuring Transaction or other corporate transaction which would effect a Restructuring Transaction without promptly informing DPS of such discussions. In order that DPS can evaluate the party and its interest and assist the Company in any subsequent discussions, the Company will promptly inform DPS of: any parties (a) previously contacted within the six months immediately preceding the date of this Agreement with respect to or interested in a Restructuring Transaction; and (b), during the period of DPS's engagement hereunder, which are in contact concerning the possibility of a Restructuring Transaction. In addition, during the term of this Agreement, DPS will promptly inform the Company if DPS is contacted by any third party with respect to the Company.

5.   Indemnification: The Company shall provide indemnification and shall satisfy other obligations set forth in Schedule I hereto, which is an integral part hereof and is hereby incorporated by reference. Further, if an Indemnified Person (as defined in Schedule I) is requested or required to appear as a witness in any Action (as defined in Schedule I) that is brought by or on behalf of or against the Company or that otherwise relates to this Agreement or the services rendered by DPS hereunder, the Company shall, subject to the provisions of Schedule I, reimburse DPS and the Indemnified Person for all reasonable expenses incurred by them in connection with such Indemnified Person appearing or preparing to appear as such a witness, including without limitation, the reasonable fees and disbursements of legal counsel. DPS understands and acknowledges that if the Company becomes the subject of a bankruptcy case, DPS may be required to modify Schedule I in accordance with applicable bankruptcy law or practice.

6.   Bankruptcy Court Approval: DPS understands that the Company has not made any decision whatsoever to commence a Chapter 11 case. In the event, however, that the Company becomes the subject of a bankruptcy case, the Company shall seek within five days following that event an order of the bankruptcy court in which such Chapter 11 case was commenced authorizing the

Company to employ DPS as a professional person pursuant to sections 327 and 328 of the Bankruptcy Code, and subject to the standard of review provided in section 328(a) of the Bankruptcy Code, pursuant to and consistent with the terms of this Agreement.

7.  Entire Agreement: This Agreement represents the entire Agreement between the parties and may not be modified except in writing signed by both parties. This Agreement may be executed in counterparts, each of which shall constitute an original. The invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provision.

8.  Affiliation: The Company recognizes that DPS has been retained only by the Company and that the Company's engagement of DPS is not deemed to be on behalf of, and is not intended to and does not confer rights upon, any security holders of the Company or any officers, agents, employees or representatives of either the Company or any of the Company's affiliates. No one other than the Company is authorized to rely upon the engagement of DPS hereunder or any statements, advice, opinions or conduct of DPS.

9.  Confidentiality: Except as contemplated by the terms hereof or as otherwise may be necessary for DPS to carry out its obligations hereunder, and except as required by applicable law and regulations or by a governmental authority or court of competent jurisdiction, DPS shall keep confidential all material nonpublic information provided to it by the Company until the earlier to occur of (i) the date eighteen months from the date of this agreement or (ii) the date such information shall have been made publicly available by the Company or by others without breach of a confidentiality agreement, and shall not disclose such information to third parties other than to such of its employees and advisors as DPS determines have a need to know without the consent of the Company. Except as may be required by applicable law and regulations or by a governmental authority or court of competent jurisdiction, any advice to be provided by DPS pursuant to its engagement hereunder shall not be disclosed publicly or made available to third parties by the Company.

10. Advertisements: Upon completion of the transactions contemplated by this Agreement, DPS may place advertisement in financial and other media at its own expense describing its services to the Company hereunder; provided, the prior written consent of the Company has been obtained; provided further, that if DPS's proposed description of its services does not include the terms of the Restructuring Transaction, the Company shall not unreasonably withhold its consent.

11. Jurisdiction and Arbitration: This Agreement will be governed by, and construed in accordance with, the laws of the State of New York applicable to agreements made and to be performed entirely in such state. Each of the parties hereto agrees to submit any claim or dispute arising out of or related to this Agreement to private and confidential arbitration by a single arbitrator selected in accordance with the rules of the American Arbitration Association. The arbitration proceedings shall be governed by the Commercial Rules of Arbitration of the American Arbitration Association and shall take place in the Borough of Manhattan, New York City, New York. The arbitrator shall have the power to order discovery and the authority to award any remedy or relief that a court of the State of New York could order or grant, including without limitation specific performance. The decision of the arbitrator shall be final and binding on each

of the parties and judgment thereon may be entered in any court having jurisdiction for the purpose of enforcement. This arbitration procedure is intended to be the exclusive method of resolving any claim arising out of or related to this Agreement, including any claim as to the validity of this Agreement. Each party agrees to the personal and subject matter jurisdiction of such arbitration for the resolution of any such claim, including any issue relating to this arbitration provision. In the event of any arbitration arising out of or in connection with this Agreement, the prevailing party in such action shall be entitled to an award of actual attorneys' fees and costs incurred in connection with the arbitration.

12.     Power and Authority: The Company has all requisite corporate power to enter into this Agreement. This Agreement has been duly authorized by all necessary corporate action on the part of the Company and has been duly executed and delivered by the Company and constitutes a legal, valid and binding agreement of the Company, enforceable in accordance with its terms.

13.     Representations, Warranties and Covenants: The Company further represents, warrants and covenants to DPS that:

(a)     neither the Company nor its affiliates have taken any action that would give any brokers, representatives, finders or other persons an interest in the compensation due to DPS in connection with any transaction contemplated herein and there are no other financial advisors or similar persons entitled to receive compensation from the Company in connection with any transaction contemplated herein; and

(b)     until the termination of this Agreement, the Company will not solicit or negotiate with or retain any other financial advisor, placement agent or underwriter in connection with a Restructuring Transaction.

14.     No Third Party Claims: Other than DPS, no (a) direct or indirect holder of any equity interests or securities of DPS whether such holder is a limited or general partner, member, stockholder or otherwise, (b) affiliate of DPS, or (c) director, officer, employee, representative, or agent of DPS, or of an affiliate of DPS or of any such direct or indirect holder of any equity interests or securities of DPS (collectively, the "Party Affiliates") shall have any liability or obligation of any nature whatsoever in connection with or under this letter Agreement or the transactions contemplated hereby, and the Company waives and releases all claims against such Party Affiliates related to any such liability or obligation.

15.     Successors and Assigns: The benefits of this Agreement, together with Schedule 1 hereto, shall inure to the respective successors and permitted assigns of the Parties hereto and any Indemnified Person, and their respective successors, permitted assigns and representatives, and the obligations and liabilities assumed in this Agreement by the Parties hereto shall be binding upon their respective successors and assigns. This Agreement and Schedule 1 hereto may not be assigned by contract without the prior written consent of the non-assigning party (or parties). If the form of Restructuring Transaction is a sale of substantially all of the assets of the Company other than in connection with a bankruptcy case of the Company, the Company shall assure that the obligations of the Company hereunder shall be assumed by such purchaser.

16. <u>Other Matters</u>: If this letter correctly sets forth our Agreement on the matters covered herein, please so indicate by signing and returning the enclosed copy of this letter and signing and retaining the duplicate we are enclosing for your records. Upon execution by both parties, this letter will constitute a legally binding Agreement between the Company and DPS.

We trust the foregoing terms and provisions are agreeable to you, and request that you sign and return the enclosed copy of this Agreement to us at your earliest convenience.


Very truly yours,

**DUFF & PHELPS SECURITIES, LLC**


By: _____
        Jon C. Melzer
Its:     Managing Director


Agreed and Accepted:

**HEARTLAND PUBLICATIONS, LLC**


By: _____
        Michael C. Bush
Its:     President and Chief Executive Officer

## Schedule I

## INDEMNIFICATION PROVISIONS

A.     Indemnification. To the fullest extent lawful, the Company will promptly, upon demand, indemnify and hold harmless Duff & Phelps Securities, LLC ("DPS"), and each director, officer, employee, agent, member and controlling person of DPS (any or all of the foregoing hereinafter referred to as an "Indemnified Person"), from and against all losses, claims, damages, reasonably documented expenses (including reasonable fees and disbursements of counsel and accountants), reasonably documented costs (including, without limitation, expenses, fees and disbursements and time charges related to giving testimony or furnishing documents in response to a subpoena or otherwise) and liabilities (joint or several), (collectively, "Losses"), as and when incurred, resulting directly or indirectly from any threatened or pending investigation, action, claim, proceeding or dispute, including securityholder actions (whether or not DPS or any other Indemnified Person is a potential or actual named party or witness) (collectively, a "Claim"), which (1) are related to or arise out of any untrue statement or alleged untrue statement of a material fact contained in any oral or written information provided to DPS or any other person by the Company or used by the Company in connection with the transaction contemplated by the engagement letter or any omission or alleged omission by the Company to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, or (2) are otherwise related to or arise out of DPS's engagement, role, activities or the performance or non-performance of professional services on the Company's behalf. The Company will not be responsible, however, for any portion of any Losses pursuant to clause (2) of the preceding sentence which are judicially determined to have resulted primarily from the willful misconduct or gross negligence of any Indemnified Person seeking indemnification hereunder; but pending any such judicial determination, the Company shall continue to be obligated on, and shall continue to perform its indemnification and reimbursement obligations. Each Indemnification Person shall promptly repay the Company such portion of any Losses previously paid to such Indemnified Person pursuant to this Schedule I or Section 5 of the Agreement in relation to the act or omission that is the subject of the judicial determination referred to above. The Company also agrees that neither DPS nor any Indemnified Person shall have any liability to the Company, its owners, parents, creditors or securityholders for or in connection with its engagement, except such liability for Losses incurred by the Company which are judicially determined to have resulted primarily from DPS's willful misconduct or gross negligence. For purposes of the foregoing, "judicially determined" shall mean determined by a court of competent jurisdiction in a final non-appealable judgment on the merits.

B.     Proceedings. DPS will notify the Company if it learns that any investigation, lawsuit, administrative proceeding or self-regulatory organization proceeding has been instituted based, directly or indirectly, on the transactions which were the subject of DPS's engagement under the Agreement, although failure to do so will not relieve the Company from any obligation or liability it has hereunder or otherwise, except to the extent such failure causes the Company to forfeit substantial rights and defenses. Should any lawsuit, administrative proceeding or self-regulatory organization proceeding (collectively, a "Proceeding") be formally instituted against DPS or any Indemnified Person based, directly or indirectly, on DPS's engagement under the Agreement, the Company will be entitled to participate therein and, to

the extent that it may wish, to assume the defense of the Proceeding, with counsel reasonably satisfactory to DPS, so long as the Company continues to pay all costs and expenses of the defense and preparation for such Proceeding. Even if the Company assumes the defense of a Proceeding, each Indemnified Person will have the right to participate in such Proceeding and to retain its own counsel at such Indemnified Person's own expense. Furthermore, each Indemnified Person shall have the right to employ its own counsel in any Proceeding and to require the Company to pay all reasonable fees and expenses of such counsel as they are incurred if (1) such Indemnified Person has been advised by such counsel that there may be legal defenses available to it which are different from or additional to defenses available to the Company, (2) the Company shall not have assumed the defense of the Proceeding and employed counsel reasonably satisfactory to such Indemnified Person in a timely matter or (3) the Company shall have authorized the employment of such counsel in connection with the defense of the Proceeding.

     C.    Contribution. If any indemnification sought by an Indemnified Person pursuant to the terms hereof is held by a court of competent jurisdiction to be unavailable for any reason (other than as a result of the gross negligence or willful misconduct of any such Indemnified Person) or insufficient to hold such Indemnified Person harmless, then the Company and DPS will contribute to the Losses for which such indemnification is held unavailable or insufficient (1) in such proportion as is appropriate to reflect the relative benefits received from the proposed transaction by the Company on the one hand and the Indemnified Person on the other, in connection with DPS's engagement referred to above (whether or not the transaction contemplated by the engagement is consummated) or (2) if (but only if) the allocation provided in clause (1) is for any reason unenforceable, in such proportion as is appropriate to reflect not only the relative benefits received from the proposed transaction by the Company on the one hand and the Indemnified Person on the other, but also the relative fault of the Company and the Indemnified Person, as well as any other relevant equitable considerations. No person found liable for fraudulent misrepresentation shall be entitled to contribution from any person who is not also found liable for such fraudulent misrepresentation. It is hereby agreed that for purposes of clause (1) above, the relative benefit to the Company on the one hand and DPS on the other, with respect to DPS's engagement, shall be deemed to be in the same proportion as (x) the total value paid or proposed to be paid or received by the Company or its stockholders, as the case may be pursuant to the transaction, whether or not consummated, for which DPS is engaged to render financial advisory services bears to (y) the fee paid or proposed to be paid to DPS in connection with such engagement (excluding reimbursable expenses).

     D.    Settlement of Claims. The Company will not, without the prior written consent of DPS which consent will not be unreasonably withheld, settle or compromise or consent to the entry of any judgment in any pending or threatened Claim or Proceeding in respect of which indemnification could be sought hereunder (whether or not DPS or any Indemnified Person is an actual party to such Claim or Proceeding) unless such settlement, compromise or consent includes provisions holding harmless and unconditionally releasing DPS and each other Indemnified Person hereunder from all liability related to or arising out of such Claim or Proceeding, including claims for contribution. The Company shall not be liable for any settlement of any Claim effected by DPS without its written consent (which consent shall not be unreasonably withheld).

     E.    Miscellaneous. The obligations of DPS are solely corporate obligations. No director, officer, employee, agent, shareholder or controlling person of DPS shall be subjected to any liability to any person, nor will any such claim be asserted by or on behalf of any other party to this Agreement. The

Company's indemnity, reimbursement and contribution obligations provided for herein are solely corporate obligations and shall: (1) be in addition to any liability that the Company otherwise may have to DPS and any rights that DPS or any Indemnified Person may have at common law or otherwise; (2) survive the completion or termination of professional services rendered by DPS under the Agreement; (3) apply to any activities prior to this date and any amendment, modification or future addition to DPS's engagement; and (4) inure to the benefit of the heirs, personal representatives, successors, and assigns of DPS and each other Indemnified Person.

If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction or other authority to be invalid, void, unenforceable or against its regulatory policy, the remainder of the terms, provisions, covenants and restrictions contained in this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated.

The Company hereby consents to personal jurisdiction and service and venue in any court in which any Claim and Proceeding which is subject to the terms provided for herein is brought against DPS or any other Indemnified Person. THE PARTIES WAIVE ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY CLAIM OR PROCEEDING RELATED TO OR ARISING OUT OF DPS'S ENGAGEMENT, ANY TRANSACTION OR CONDUCT IN CONNECTION THEREWITH OR THIS AGREEMENT.

# DUFF & PHELPS SECURITIES, LLC

December 23, 2009

*Privileged and Confidential*

Michael C. Bush
President and Chief Executive Officer
Heartland Publications, LLC
1 West Main Street
Clinton, CT 06413

Dear Michael:

This letter (the "Amendment") relates to that certain engagement letter ("Agreement") dated July 29, 2009 between Heartland Publications, LLC ("Heartland" or the "Company") and Duff & Phelps Securities, LLC ("DPS"). Pursuant to the Agreement, DPS is acting as exclusive financial advisor to the Company. All capitalized terms used, but not otherwise defined herein, shall have the meaning given to them in the Agreement. The Company and DPS wish to supplement the terms of the Agreement. Accordingly, the Company and DPS hereby agree:

1. In addition to the services outlined in paragraph 1 of the Agreement, DPS will work at the reasonable request and direction of the Company to:

    a. Prepare a confidential information memorandum and a summary which will be discussed with and approved by the Company;

    b. Prepare a list of potential purchasers including strategic parties and private equity firms;

    c. Contact potential purchasers to solicit their interest in the Sale (as defined below) and to provide them with the confidential information memorandum under a non-disclosure agreement;

    d. Participate in due diligence visits, meetings and consultations between the Company and interested potential purchasers and coordinate distribution of all information related to the Sale to such parties;

    e. Assist the Company with evaluating offers and selecting a party who is ready, willing and able to consummate the Sale;

    f. Assist the Company in negotiating agreements and definitive contracts;

    g. Organize and execute an auction, if necessary, with the objective of obtaining the best price and terms for the Sale; and

    h. Provide such other advice and services related to the Sale as DPS and the Company shall mutually agree.

2.  Paragraph 3a of the Agreement shall be amended to include the following:

    a.  The Monthly Advisory Fee will no longer be due and payable on the anniversary of the Engagement Date. It will instead be due and payable on the date of the Chapter 11 filing (i.e., December 21, 2009) and thereafter on each monthly anniversary of the filing date.

3.  Paragraph 3 of the Agreement shall be amended to include the following:

    a.  Sale Fee: If a Sale occurs either: (i) during the term of DPS's engagement hereunder or (ii) at any time during the 12 month period following the effective date of termination of DPS's engagement hereunder, the Company agrees to pay DPS a nonrefundable success fee ("Sale Fee"), payable in cash concurrently with closing of the Sale, equal to the greater of (i) the sum of 1.25% of the first $115 million of Consideration and 3.0% of any Consideration above $115 million, and (ii) $850,000. In no event shall DPS be entitled to both a Restructuring Fee and a Sale Fee, provided, however, if both fees are applicable, DPS shall be entitled to the greater of the two fees.

    b.  "Sale" shall mean any transaction or series or combination of transactions whereby, directly or indirectly, control of, or a material interest in, the Company or any material portion of its businesses or assets is transferred for Consideration, including, without limitation, a sale or exchange of capital stock or assets, a lease of assets with or without a purchase option, a merger or consolidation, a tender or exchange offer, a leveraged buy-out, the formation of a joint venture, or any similar transaction.

    c.  "Consideration" shall mean the aggregate value of all cash, securities and other property paid in connection with the Sale, including all indebtedness of the Company repaid or assumed, directly or indirectly, (by operation of law or otherwise) in connection with the Sale. In the event that the Consideration received in a Sale is paid in whole or in part in the form of securities or other property, then, for purposes of calculating DPS's fees hereunder, the value of such securities or other property shall be the fair market value thereof on the day immediately preceding the consummation of the Sale; provided, however, that if such securities consist of securities with an existing public trading market, the value thereof shall be determined by the average of the last sales prices of such securities on the 30 trading days immediately preceding the consummation of the Sale. Any amounts payable to the Company, any shareholder of the Company or any affiliate of the Company in connection with a noncompetition, employment, consulting, licensing, supply or other agreement shall be deemed Consideration except in the case of employment or consulting agreement to the extent such amounts represent the fair value of services to be rendered. If all or a portion of the Consideration payable in connection with the Sale includes contingent future payments, then the Consideration related to such payments shall equal the present value of the reasonably expected maximum amount of such payments (as such amount is determined in good faith between the Company and DPS) using a discount rate of eight percent (8%). If the Consideration to be paid is computed in a foreign currency, the value of such foreign currency, for purposes of calculating DPS's fees hereunder, shall be converted into U.S. Dollars at the prevailing exchange rate on the date on which the Sale is consummated.

Except as supplemented, amended or modified hereby, the Agreement shall remain in full force and effect in accordance with its terms and conditions. If the foregoing correctly sets forth our understanding, please sign and return to us an executed copy of this letter, whereupon this letter shall constitute a binding agreement as of the date first above written.

Sincerely,

**DUFF & PHELPS SECURITIES, LLC**

By: _____

Jon C. Melzer
Managing Director

Agreed and Accepted:

**HEARTLAND PUBLICATIONS, LLC**

By: _____

Michael C. Bush
President & Chief Executive Officer